# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
### *Tampa Division*

|  |  |
|---|---|
| UNITED STATES OF AMERICA, STATE OF FLORIDA *ex rel.* [UNDER SEAL]<br><br>*Plaintiffs,*<br><br>v.<br><br>[UNDER SEAL]<br><br>*Defendant.* | **Case No.**<br>8:24 cv 693 SDM – AAS<br><br>**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. and The Florida False Claims Act, Fla. Stat. § 68.081**<br><br>**FILED UNDER SEAL pursuant to 31 U.S.C. § 3730(b)(2)**<br><br>**Jury Trial Demanded** |

R. Scott Oswald (Florida Bar No. 158437)
Janel Quinn (to be admitted *pro hac vice*)
THE EMPLOYMENT LAW GROUP, P.C.
1717 K St., NW, Suite 1110
Washington, D.C. 20006
Telephone: 202-261-2806
Facsimile: 202-261-2835
soswald@employmentlawgroup.com
jquinn@employmentlawgroup.com

*Counsel for Plaintiff-Relator*

TYG – 70122
$405

# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
### *Tampa Division*

UNITED STATES OF AMERICA, STATE
OF FLORIDA *ex rel.*
NINA D'ANDREA

     *Plaintiffs,*

v.

SARASOTA MEMORIAL HEALTH
CARE SYSTEMS,

     Registered Agent:
     Cathy LeBeau
     Legal Services Office
     1700 S. Tamiami Trail
     Sarasota, Florida 34239

     *Defendant.*

Case No.

 

**Complaint for Violations of
the Federal False Claims
Act, 31 U.S.C. §§ 3729 *et
seq*. and The Florida False
Claims Act, Fla. Stat. §
68.081**

**FILED UNDER SEAL
pursuant to 31 U.S.C. §
3730(b)(2)**

**Jury Trial Demanded**

## INTRODUCTION

1.      *Qui Tam* Relator Nina D'Andrea, by and through counsel, on behalf of herself, the United States of America, and the State of Florida, brings this action against Defendant Sarasota Memorial Healthcare Systems to recover damages and civil penalties arising from false or fraudulent statements and claims made, used, or caused to be made or used by Defendant in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and the and the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

2.      As will be outlined in greater detail below, Defendant violated the FCA when it falsely billed patient medical visits to conducted by Registered Nurses (RN) under a Medical Doctor's (MD) name and billing credentials. The claims submitted to the United States government for reimbursement under the Medicare and Medicaid programs made visits appear as though they had been performed or supervised by an MD, despite the assigned anti-coagulation clinic MD being off-site and unavailable during the reported medical visits and no other provider being on site to provide supervision.

3.      Beginning in or around 2018, the Defendant began to understaff the anti-coagulation clinic. This circumstance lasted until early 2023. From 2018 until 2023, Defendant knowingly submitted false claims to the United States and the

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-1-

State of Florida (collectively "the government") for reimbursement under the Medicare and Medicaid programs for services that were not rendered or supervised by a provider as required and as claimed.

## PARTIES

4.     **Relator Nina D'Andrea** is a U.S. citizen and resident of Sarasota County, Florida. D'Andrea graduated from Manatee Community College in May 2000 with an Associate's Degree in Nursing. She graduated from the University of Phoenix in February 2005 with a Bachelor of Science in Nursing, and from Ball State University with a Master's of Science as a Family Nurse Practitioner in May 2010.

5.     From July 2000 through July 2009, D'Andrea worked as a Registered Nurse (RN) for Sarasota Memorial Hospital (2000-2002; 2004-2009) and Doctor's Hospital (2002-2004).

6.     From 2013 to 2016, D'Andrea worked as an Advanced Practice Registered Nurse Practitioner (APRN) for various medical facilities, eventually landing back at Sarasota Memorial Hospital in February 2016 as an APRN at the off-site anti-coagulation clinic.

7.     D'Andrea's last day of work at Sarasota Memorial Hospital was December 29, 2023.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-2-

8.     **Defendant Sarasota Memorial Healthcare System** (SMHS) is a full-service health system serving the Sarasota, Florida community. Its flagship facility is Sarasota Memorial Hospital.

9.     Relevant to this Complaint, SMHS has approximately four off-site anti-coagulation and disease-specific clinics with rotating schedules and staff. Relator estimates each outpatient anti-coagulation clinic sees approximately 20-30 patients per day depending on the clinic site. Relator estimates each outpatient clinic sees approximately four to eight new patients per month. Across all four off-site clinics, Relator estimates approximately 1,000 patients are seen per month, with roughly 800 of those patients being insured through Medicare and approximately 10% being Florida Medicaid beneficiaries.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), as the alleged misconduct took place in this jurisdiction, and 28 U.S.C. § 1331 as this action arises under the laws of the United States of America to redress violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

11.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because the

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-3-

Defendant has at least minimum contacts with the United States, and can be found in, transacts in, or has transacted in, business in this District.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because the complained-of illegal acts giving rise to this action occurred within this judicial district and because Defendant can be found in, transacts in, or has transacted in, business in this district.

13.     The specific facts, circumstances, and allegations of Defendant's violations of the federal False Claims Act has not been publicly disclosed in a civil suit, criminal suit, or administrative civil money penalty proceeding in which the government is already a party.

14.     Relator's claims in this Complaint are not based on allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

## PROCEDURAL HISTORY

15.     Relator D'Andrea is the original source of all the information upon which this Complaint is based, as that phrase is used in the federal False Claims Act. There has been no public disclosure of the allegations contained in this Complaint.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-4-

16.     To the extent that there has been a public disclosure unknown to the Relator, she is the "original source" and meets the requirements of 31 U.S.C. § 3730(e)(4)(B) and Fla. Stat. § 68.087. Relator has direct and independent knowledge of the information upon which the allegations are based and has voluntarily provided this information to the government prior to filing this action under seal, as required by 31 U.S.C. § 3730(b)(2) and Fla. Stat. § 68.087.

17.     Relator has direct and independent knowledge of the information on which the allegations herein are based and voluntarily provides this information to the United States prior to filing this action as required by 31 U.S.C. § 3730(e)(4).

## LEGAL BACKGROUND

## I.     The False Claims Act ("FCA")

18.     The FCA provides, in part, that any person who

"(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[;]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ...or[;]

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-5-

Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person."

31 U.S.C. § 3729(a)(1).

19. For purposes of the FCA,

"[T]he terms 'knowing' and 'knowingly'—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud."

31 U.S.C. § 3729(b)(1).

## II.    The Florida False Claims Act

20.    The Florida FCA provides, in part, that any person who commits the following enumerated acts is liable for treble damages, civil penalties, and litigation costs:

"(2)(a)Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval[;]

(2)(b)  Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim[;]

[or]

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-6-

(2)(g) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state[;]"

Fla. Stat. § 68.082.

21.     The Florida False Claims Act defines "knowing" and "knowingly" as meaning that a person, with respect to information, "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." The Florida False Claims Act requires no proof of specific intent to defraud. Fla. Stat. § 68.082.

22.     The Eleventh Circuit recognizes the material elements of fraud under the False Claims Act as: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015).

### III.    Medicare Program

23.     In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C. § 1395, *et seq.* ("the Medicare Program" or "Medicare") authorizing the federal Government to pay for the cost of certain medical services for persons 65

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-7-

years or older, disabled individuals, or patients requiring the use of short-term or long-term anticoagulants.

24.     When hospitals and physicians render services and supplies to Medicare or Medicaid beneficiaries, Medicare or Medicaid, respectively, will reimburse the healthcare provider for those services and supplies, based on set rates.

25.     Participating healthcare providers file claims for services or supplies rendered under the Medicare or Medicaid programs. When a healthcare provider files a reimbursement claim for services rendered, correct coding is key to submitting valid claims. The proper procedures for coding are listed in Chapter 23 of the Medicare Claims Processing Manual, entitled Fee Schedule Administration and Coding Requirements.

26.     The United States, through the Department of Health and Human Services ("HHS"), and specifically the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare program which now has four parts: Part A covers inpatient hospital treatment; Part B is traditional medical insurance that covers outpatient doctors' services and care; Part C is Managed Care Plans managed by private insurance providers; and Part D provides prescription drug coverage.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-8-

27. CMS maintains the Healthcare Common Procedure Coding System (HCPCS) and publishes coding tables quarterly, listing the codes used by health care providers to be reimbursed for services covered by Medicare and Medicaid. The Current Procedural Terminology ("CPT") code set is published by the American Medical Association ("AMA") and included in the CMS tables. The CPT code books include guidance and instructions on which codes to use and when. The American Hospital Association maintains the UB-04 Data Specifications Manual and is the official source for billing information adopted by the National Uniform Billing Committee (NUBC).

28. Medicare reimbursement to providers of medical services is accomplished through private insurance carriers, as provided by 42 U.S.C. § 1395u. The carrier, on behalf of the Medicare Program, reviews and approves claims submitted for reimbursements by Medicare providers.

29. Although the Medicare contractor is checking for errors, the certifying physician or supplier is ultimately responsible for the accuracy of the information upon which the claim is based.

30. Federal law prohibits providers from making "any false statement or representation of a material fact in any application for any . . . payment under a federal healthcare program." *See* 42 U.S.C. § 1320a-7(B)(A)(1).

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-9-

31.    Medicare, including Medicare Parts B and C plans, covers and provides reimbursement for the clinics' services, which include performing monitoring appointments and providing dosing information to patients.

32.    The Medicare Program requires basic elements for a claim to be properly coded and submitted for reimbursement. 42 U.S.C. § 424.32.

33.    The Medicare Program defines a physician as,

(a) "a doctor of medicine; doctor of osteopathy; doctor of dental surgery or of dental medicine; doctor of podiatric medicine; or doctor of optometry who is legally authorized to practice medicine, osteopathy, dental surgery, dental medicine, podiatric medicine, or optometry by the State in which he performs such function and who is acting within the scope of his license when he performs such functions."

42 U.S.C. § 405.400.

34.    The Medicare Program defines a practitioner as, "a physician assistant, nurse practitioner, clinical nurse specialist, certified registered nurse anesthetist, certified nurse midwife, clinical psychologist, clinical social worker, registered dietitian or nutrition professional, who is currently legally authorized to practice in that capacity by each State in which he or she furnishes services to patients or clients." *Id.*

35.    Further, nurse practitioners ("NPs") are covered as providers under Medicare Part B for the purposes of reimbursement. "For Medicare Part B coverage of his or her services, a nurse practitioner must be a registered

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-10-

professional nurse who is authorized by the State in which the services are

furnished to practice as a nurse practitioner in accordance with State law." 42 CFR

§ 410.75.

36.    For an NP's services to be reimbursable under Medicare:

"(c) **Services**. Medicare Part B covers nurse practitioners' services in all settings in both rural and urban areas, only if the services would be covered if furnished by a physician and the nurse practitioner—

(1)    Is legally authorized to perform them in the State in which they are performed;

(2)    Is not performing services that are otherwise excluded from coverage because of one of the statutory exclusions; and

(3)    Performs them while working in collaboration with a physician.

(i)    Collaboration is a process in which a nurse practitioner works with one or more physicians to deliver health care services within the scope of the practitioner's expertise, with medical direction and appropriate supervision as provided for in jointly developed guidelines or other mechanisms as provided by the law of the State in which the services are performed.

(ii)    In the absence of State law governing collaboration, collaboration is a process in which a nurse practitioner has a relationship with one or more physicians to deliver health care services. Such collaboration is to be evidenced by nurse practitioners documenting the nurse practitioners' scope of practice and indicating the relationships that they have with physicians to deal with issues outside their scope of practice. Nurse practitioners must document this collaborative process with physicians.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-11-

(iii) The **collaborating physician** does not need to be present with the **nurse practitioner** when the services are furnished or to make an independent evaluation of each patient who is seen by the nurse practitioner."

CFR § 410.75. (emphasis added)

37. Under Medicare guidelines,

b. "[p]hysician services means the following services to the extent that they are covered by Medicare:

(1) Professional services of doctors of medicine and osteopathy (including osteopathic practitioners), doctors of optometry, doctors of podiatry, doctors of dental surgery and dental medicine, and chiropractors;

(2) Supplies and services covered "incident to" physician services (excluding drugs as specified in § 414.36);

(3) Outpatient physical and occupational therapy services if furnished by a person or an entity that is not a Medicare provider of services as defined in § 400.202 of this chapter."

42 U.S.C. § 414.2.

38. To be covered "incident to" the services of a physician or other practitioner, services and supplies must be: An integral, although incidental, part of the physician's professional service (see §60.1); Commonly rendered without charge or included in the physician's bill (see §60.1A); Of a type that are commonly furnished in physician's offices or clinics (see §60.1A); **Furnished by the physician or by auxiliary personnel under the physician's direct**

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-12-

**supervision** (see §60.1B)." Medicare Benefit Policy Manual, Chapter 15, § 60.1

(emphasis added); *see also* 42 CFR § 410.26.

39.     Auxiliary personnel means:

c.      "any individual who is acting under the supervision of a
physician…the physician personally furnishing the services or supplies or
supervising the auxiliary personnel furnishing the services or supplies must
have a relationship with the legal entity billing and receiving payment for the
services or supplies that satisfies the requirements for valid reassignment.
**Thus, where a physician supervises auxiliary personnel to assist him/her
in rendering services to patients and includes the charges for their
services in his/her own bills, the services of such personnel are
considered incident to the physician's service if there is a physician's
service rendered to which the services of such personnel are an
incidental part and there is *direct* supervision by the physician.**"

Medicare Benefit Policy Manual, Chapter 15, § 60.1B (emphasis added).

40.     Direct supervision means:

d.      "**in the office setting**…in the office setting means the physician (or
other supervising practitioner) must be present in the office suite and
immediately available to furnish assistance and direction throughout the
performance of the procedure. It does not mean that the physician (or other
supervising practitioner) must be present in the room when the procedure is
performed. Through December 31, 2024, the presence of the physician (or
other practitioner) includes virtual presence through audio/video real-time
communications technology (excluding audio-only)."

42 CFR § 410.32(b)(3)(ii) (emphasis added).

**IV.     Florida Medicaid program**

42.     The Florida Medicaid program is authorized by Chapter 409 of the

Florida Statutes and Chapter 59G of the Florida Administrative Code.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-13-

43.     The Medicaid Program is a joint state-federal program that provides health benefits for particular groups of people such as indigent and disabled individuals. The federal portion of each state's Medicaid payments is based on a state's per capita income.

44.     Submission of false claims to the Medicaid program necessarily results in false claims being submitted to Florida Medicaid because those claims, once processed, are partially paid by the Florida Department of Health. Agency for Healthcare Administration ("AHCA").

45.     The federal government pays a share of each state's Medicaid expenditures. The federal medical assistance percentage ("FMAP") calculation determines the amount of federal reimbursement for each state's Medicaid expenditures. FMAP is calculated using the per capita income amounts of the state relative to total U.S. per capita income.

46.     Medicaid providers submit claims for payments to states. States then pay the claims and seek partial reimbursement from the federal government.

47.     In 2023, the State of Florida had an FMAP of 66.25%.

## V.     Florida Nurse Practice Act

48.     The Florida Nurse Practice Act ("FNPA") provides the framework to govern the safe and professional practice of nursing care.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-14-

49.     Under the FNPA,

> **'Advanced or specialized nursing practice'** means, in addition to
> the practice of professional nursing, the performance of advanced-
> level nursing acts approved by the board which, by virtue of postbasic
> specialized education, training, and experience, are appropriately
> performed by an advanced practice registered nurse. Within the
> context of advanced or specialized nursing practice, the advanced
> practice registered nurse may perform acts of nursing diagnosis and
> nursing treatment of alterations of the health status. The advanced
> practice registered nurse may also perform acts of medical diagnosis
> and treatment, prescription, and operation as authorized within the
> framework of an established supervisory protocol. The department
> may, by rule, require that a copy of the protocol be filed with the
> department along with the notice required by s. 458.348."

Florida Nurse Practice Act, Title XXXII, Chapter 464, Section 003(2) (emphasis in
original).

50.     Under the FNPA, "**'Advanced practice registered nurse'** means any

person licensed in this state to practice professional nursing and who is licensed in

an advanced nursing practice, including certified nurse midwives, certified nurse

practitioners, certified registered nurse anesthetists, clinical nurse specialists, and

psychiatric nurses." Florida Nurse Practice Act, Title XXXII, Chapter 464, Section

003(3).

51.     "**'Autonomous practice'** means advanced nursing practice by an

advanced practice registered nurse who is registered under s. 464.0123 and who is

not subject to supervision by a physician or a supervisory protocol." Florida Nurse

Practice Act, Title XXXII, Chapter 464, Section 003(5).

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-15-

52.     "'**Registered nurse'** means any person licensed in this state or holding an active multistate license under s. 464.0095 to practice professional nursing." Florida Nurse Practice Act, Title XXXII, Chapter 464, Section 003(21).

## VI.   CLINIC BILLING PROTOCOLS

53.     In the SMSH anti-coagulation clinic, several CPT codes are used to bill for the services provided in the clinic. The most common include the following five codes: 85610—Finger Stick; 99211—Level 1 Follow-up; 99212—Level 2 Follow-up; 99213—Level 3 Follow-up; 99203—Level 3 New Patient; and 99204—Level 4 New Patient.

54.     As outlined above, RNs, as auxiliary personnel, are required to be under direct supervisor of the clinic MD or an NP at all times for care rendered. RNs are not permitted to conduct new patient visits or perform any diagnostic or medical services absent the direct supervision of an NP or MD.

55.     By contrast, NPs can perform services, to include new patient appointments, without the direct supervision of the clinic MD pursuant to their licensure.

56.     At all times relevant to this complaint, Relator has been aware that RNs have been present in the clinic and performing services on patients without the direct supervision of the MD or a NP.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-16-

57.    At all times relevant to this complaint, Relator has been aware that, while unsupervised, RNs have conducted patient visits within the anti-coagulation clinic. After performing services, SMHS bills for the services provided by the RNs that the RNs entered in the SMHS internal systems under the clinic MD's name, Dr. Mark Ramos.

58.    Specifically, Relator is aware of unsupervised RNs conducting follow-up visits with patients and performing basic tests, such as a finger stick. These services are then billed to Medicare and Medicaid by SMHS using codes of 85610, 99211, and 99212 under Dr. Ramos' credentials.

## FACTUAL ALLEGATIONS

59.    Relator D'Andrea has over 20 years of nursing experience. As part of her education and experience, D'Andrea frequently worked with CPT codes. Further, she has completed training on the codes necessary and appropriate for the care she provides as well as the care RNs and NPs are permitted to provide under supervision.

### A.    Relator joins the SMHS anti-coagulation clinic.

60.    In February 2016, D'Andrea joined SMHS at one of its four anti-coagulation clinics as a NP. The clinics are not located on the main SMHS campus, but rather off-site. When D'Andrea joined SMHS, the clinic staff at D'Andrea's

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-17-

clinic included four rotating NPs, five rotating RNs, one Licensed Practical Nurse ("LPN"), and one MD.

61.    A NP or MD is required to be onsite working whenever a RN is scheduled to work at a clinic; however, a NP can be scheduled without a MD or RN on site.

62.    In 2018, new blood thinners were released to the healthcare market, leading to a decline in the anti-coagulation clinic's patient volume. As a result, the staffing at the clinics was cut to two rotating full-time NPs with one per diem NP, three RNs, and one MD of record, Dr. Ramos. From 2018 until 2023, staffing remained at these levels.

63.    Despite being listed as a staff member at the clinic, Dr. Ramos was never scheduled to work at the clinics and was never physically present at the clinics.

64.    After staffing was cut, the clinic began knowingly scheduling RNs and LPNs to work the clinics without a NP or Dr. Ramos on site. This occurred two to four days per week from 2018 until 2023.

**B.    Relator finds false patient records indicating she had performed services.**

65.    Since D'Andrea joined SMHS in February 2016, no MD has been physically on site at the clinics for any reason. Dr. Ramos has not been present on

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-18-

site, as he has always worked from his own cardiology practice, Intercoastal Medical Group, outside of the SMHS system. His primary method of communication with the SMHS anti-coagulation clinic staff is via email or text, or phone call if necessary.

66.     Beginning in 2018, D'Andrea found patient records where the RN or LPN had entered D'Andrea's name on the chart for services that were provided when D'Andrea was not present or scheduled in the clinic.

67.     D'Andrea was concerned that the records indicated she was the provider when she was not, and she was concerned because RNs are not allowed to provide services unless the services are incident-to the provider's care and under the direct supervision of the provider.

68.     After discovering these patient records with her name written in, D'Andrea told the RNs and LPN they could not continue their practice of billing under her name when she was not onsite or providing direct supervision to them. Thereafter, the RNs and LPN began entering Dr. Ramos' name and credentials on all charts as if he had performed or supervised the service.

69.     For example, on February 2, 2021, RN Angela McSweeney conducted a patient visit during which an anticoagulation medication was administered to the patient. Dr. Ramos was not present during this visit (physically or virtually) to

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-19-

provide direct supervision. Further, an NP was not assigned to work in the clinic on

February 2, 2021.



United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems
Qui Tam Complaint – Filed Under Seal

-20-

Ex. 1, Excerpted Patient Record for February 2, 2021.



Ex. 2, Anticoagulation clinic schedule for February 2, 2021, indicating no NP scheduled.

## C. Defendant has knowledge of insufficient supervision and subsequent false claims submitted for payment.

70.    D'Andrea estimates this kind of scheduling, as exemplified *supra*, has

occurred approximately 100 days per year between 2018 and 2023. On these days,

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-21-

no NP or MD is staffed at the clinic and the RNs perform all the services. SMHS then bills Medicare and Medicaid for these improperly administered services under Dr. Ramos' name for services he did not perform and did not supervise.

71.     SMHS bills Medicare and Medicaid for a follow up visit using CPT Code 99211, 99212, or 99213 and for a finger stick using CPT Code 85610.

72.     Starting in mid-spring 2023, SMHS began scheduling a NP onsite at all times.

73.     D'Andrea and another NP, Elizabeth Miller, spoke with manager Abby Holladay several times throughout the years about their concerns for the days when no NP was scheduled on site (and the MD was not present) to provide supervision to RNs and LPNs. D'Andrea and Miller emphasized that it was prudent to have an NP scheduled at a minimum, even if Dr. Ramos was unavailable.

74.     Holladay frequently replied that she was aware the clinic locations were supposed to have an NP, but because of staffing shortages, SMHS had to do business without the additional NP scheduling.

75.      At one point, Holladay told D'Andrea, "this is just how it has to be."

76.     D'Andrea resigned from SMHS in December 2023.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-22-

77.     Despite making efforts to schedule a NP onsite at all times beginning in mid-spring 2023,  following D'Andrea's resignation, the clinics have remained understaffed, without a NP regularly scheduled to provide direct supervision. Dr. Ramos has remained absent from the clinic.

**D.     Defendant's false claims for payment are material to government payors.**

78.     "Auxiliary personnel means any individual who is acting under the supervision of a physician." Medicare Benefit Policy Manual, Chapter 15, § 60.1B.

79.     An RN qualifies as "auxiliary personnel" under Medicare. *Id.*

80.     For services to be billed and reimbursed as "incident to" the services of a physician or other practitioner, care administered by auxiliary personnel must be performed under the physician's direct supervision. *Id.*

81.     "**Direct supervision** in the office setting means the physician (or other supervising practitioner) must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. 42 CFR § 410.32(b)(3)(ii) (emphasis in original).

82.     While 42 CFR § 410.32(b)(3)(ii) permits for virtual presence of the physician or nurse practitioner, no MD or NP was scheduled or otherwise readily available virtually for patient care when RNs were scheduled without an NP.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-23-

83.    "[W]here a physician supervises auxiliary personnel to assist him/her in rendering services to patients and includes the charges for their services in his/her own bills, the services of such personnel are considered incident to the physician's service if there is a physician's service rendered to which the services of such personnel are an incidental part and there is direct supervision by the physician." Medicare Benefit Policy Manual, Chapter 15, § 60.1B.

84.    RNs, as auxiliary personnel, cannot perform or bill for <u>any</u> service as "incident to" without the clinic MD or an NP on site and providing direct supervision.

85.    The excerpted exhibits included *supra* provide one representative example of several wherein a patient was seen and treated by an RN absent supervision from Dr. Ramos and/or a NP.

**E.    Damages.**

86.    The excerpted exhibits included *supra* provide just one example of several available records wherein a patient was seen and treated by an RN absent supervision from Dr. Ramos and/or a NP.

87.    As a result of the knowing submission of false records for reimbursement by services performed by RNs without MD or NP supervision, the Defendant caused Medicare and Medicaid to pay out claims for clinic treatments

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-24-

that were not eligible as "incident to" services and were not provided by the

provider submitting reimbursement requests, thereby damaging Medicare and

Medicaid in an amount to be determined at trial.

## COUNT I
### Violation of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

88.     Relator incorporates the allegations contained in paragraphs 1 through

84 as if set forth in full herein.

89.     31 U.S.C. § 3729(a)(1)(A) provides liability for any person who

knowingly presents, or causes to be presented, to an officer or employee of the

United States a false or fraudulent claim for payment or approval.

90.     Defendant knowingly presented or caused to be presented false or

fraudulent claims for payment or approval to the United States through the

Medicare and to Florida through Medicaid programs when it submitted, or caused

to be submitted, claims for reimbursement for services provided by RNs without

the requisite supervision of an NP or MD.

91.     Defendant knew these claims for payment to the government were

false or fraudulent as defined by the FCA.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-25-

92.     The United States, unaware of the falsity of the claims made by Defendant or caused to be made by Defendant, and in reliance on the accuracy of those claims, paid out those claims to Defendant.

93.     Had the United States known Defendant was billing for services that were fraudulently performed and/or fraudulently coded as having been performed under the supervision of an NP or MD, it would not have paid those claims.

94.     As a result of the false or fraudulent claims presented or caused to be presented by Defendant, the United States has suffered damages, in an amount to be determined at trial.

### COUNT II
### Violation of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

95.     Relator incorporates the allegations contained in paragraphs 1 through 84 as if set forth in full herein.

96.     31 U.S.C. § 3729(a)(1)(B) provides liability for any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

97.     Defendant knowingly made, or caused to be made, false records or statements material to a false, or fraudulent claims when they falsely applied the

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-26-

name of a provider, to include, D'Andrea and Dr. Ramos on patient charts for claims for services that the provider did not provide and did not supervise.

98.   Defendant knew these records were false.

99.   The United States, unaware of the falsity of the statement or records in support of the false claims made by Defendant or caused to be made by Defendant, and in reliance of the accuracy of those statements and records, reimbursed Defendant for those claims.

100.   Had the United States known Defendant was billing for services that were supported by false records or statements, it would not have paid those claims.

101.   Because of these false or fraudulent claims presented or caused to be presented by the Defendant, the United States has suffered damages, in an amount to be determined at trial.

### COUNT III
### Violation of the Florida False Claims Act
### Fla. Stat. § 68.082(2)(a)

102.   Relator incorporates the allegations contained in paragraphs 1 through 84 as if set forth in full herein.

103.   Defendant knowingly presented or caused to be presented to the state and its officials, false or fraudulent claims in order to obtain payment or approval from the state, in violation of Fla. Stat. § 68.082(2)(a).

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-27-

104.   Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States and the State of Florida through the Medicaid program when it submitted, or caused to be submitted, claims for reimbursement for services provided by RNs without the requisite supervision of an NP or MD.

105.   Defendant knew these claims for payment to the government were false or fraudulent as defined by the Florida FCA.

106.   Florida, unaware of the falsity of the claims made by Defendant or caused to be made by Defendant, and in reliance on the accuracy of those claims, paid out those claims to Defendant.

107.   Had Florida known Defendant was billing for services that were fraudulently performed and/or fraudulently coded as having been performed under the supervision of an NP or MD, it would not have paid those claims.

108.   As a result of the false or fraudulent claims presented or caused to be presented by Defendant, the government has suffered damages, in an amount to be determined at trial.

109.   The government has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-28-

as of yet undetermined amount through its funding of the Florida Medicaid Program.

## COUNT IV
### Violation of the Florida False Claims Act
### Fla. Stat. § 68.082(2)(a-b)

110.    Relator incorporates the allegations contained in paragraphs 1 through 84 as if set forth in full herein.

111.    Defendant knowingly presented or caused to be presented to the state and its officials, false or fraudulent claims in order to obtain payment or approval from the state, in violation of Fla. Stat. § 68.082(2)(b).

112.    Defendant knowingly made, or caused to be made, false records or statements material to a false, or fraudulent claims when they falsely applied the name of a provider, to include, D'Andrea and Dr. Ramos on patient charts for claims for services that the provider did not provide and did not supervise.

113.    Defendant knew these records were false.

114.    Florida, unaware of the falsity of the statement or records in support of the false claims made by Defendant or caused to be made by Defendant, and in reliance of the accuracy of those statements and records, reimbursed Defendant for those claims.

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-29-

115.    Had the government known Defendant was billing for services that were supported by false records or statements, it would not have paid those claims.

116.    Because of these false or fraudulent claims presented or caused to be presented by the Defendant, the government has suffered damages, in an amount to be determined at trial.

117.    The State of Florida has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount through its funding of the Florida Medicaid Program.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of herself, the State of Florida, and the United States are entitled to damages from Defendant in accordance with the provisions of 31 U.S.C. §§ 3729 *et seq.* and Fla. Stat. § 68.081 *et seq.* and Relator requests that judgment be entered against Defendant, as follows:

a)  That for violations of the False Claims Act, 31 U.S.C. §3729, *et seq.*, this Court enter judgment against the Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendant's actions, plus the maximum civil penalty for each act in violation of 31 U.S.C. §3729;

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam* Complaint – Filed Under Seal

-30-

b) That for violations of the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*, this Court enter judgment against the Defendant in an amount equal to three times the amount of damages the State of Florida has sustained because of the Defendant's actions, plus the maximum civil penalty for each act in violation of Fla. Stat. § 68.081, *et seq*;

c) That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d), including the costs and expenses of this action and reasonable attorneys' fees and costs;

d) That, in the event the United States and State of Florida elects to intervene in and proceed with this action, Relator be awarded between 15% and 25% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(1) and Fla. Stat. § 68.085 (1)(a) (2019).

e) That, in the event that the United States and State of Florida does not proceed with this action, Relator be awarded between 25% and 30% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(2) and Fla. Stat. § 68.085 (2) (2019).

f) That, pursuant to 31 U.S.C. § 3730(c)(5) and Fla. Stat. § 68.084 (5) (2019)., Relator be awarded a share of any alternate remedy that the United States or State of Florida elects to pursue;

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-31-

g) That permanent injunctive relief be granted to prevent any recurrence of the
False Claims Act and Florida False Claims Act conduct described above for
which redress is sought in this Complaint;

h) That the United States, State of Florida, and the Relator be awarded
prejudgment and post judgment interest; and

i) That the United States, State of Florida, and the Relator receive all relief,
both at law and in equity, to which they may be reasonably entitled.

j) For such other and further relief as this Court deems just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator

hereby demand a jury trial on all claims alleged herein.

Dated: March 14, 2024            Respectfully submitted,

R. Scott Oswald (Florida Bar No. 158437)
Janel Quinn (to be admitted *pro hac vice*)
THE EMPLOYMENT LAW GROUP, P.C.
1717 K St., NW, Suite 1110
Washington, D.C. 20006
Telephone: 202-261-2806
Facsimile: 202-261-2835
soswald@employmentlawgroup.com
jquinn@employmentlawgroup.com

*Counsel for Relator*

*United States, State of Florida, ex rel., D'Andrea v. Sarasota Memorial Healthcare Systems*
*Qui Tam Complaint – Filed Under Seal*

-32-